Our fifth case this morning, United States v. David Major. Good morning, Your Honors. Please, the Court. Good morning. Mark Rosen appears on behalf of the defendant, David Major. First of all, I don't think the legal issues are really in dispute here. I think it's pretty clear that under Lucas, the government has the burden of proving factual matters by reliable evidence to preponderance of the evidence. I think, with respect to the obstruction of justice argument, I think it's pretty clear, based upon a motto, that they have to prove it has to be done by – that my client had the conscious intent to obstruct justice. And I don't think that any of that has been proven here with respect to all four of the issues I've argued with respect to the law. I think, with respect to the drug delivery issue that they're saying that somehow my client's drugs had caused the death of A.K., I think the evidence is clearly insufficient. And I don't think the evidence is even reliable to show that those drugs, if he had dealt them to Bukowski, had caused A.K.'s death. I think the timeline is clearly contrary to showing that. Her conduct – well, not her conduct – A.K.'s reaction to the drugs for about a two-hour period when she was under constant observation by either Bukowski or the Uber driver, and then her mother, when she got home, shows that all she was was mildly impaired. She gets home about 8 o'clock, and then she's not discovered until 6 o'clock in the next morning with fresh track marks in her arms, needle marks in her arms, as the law enforcement had said, clearly shows that those drugs had not the effect or the ability to cause her death and did not cause her death. And I think that that's – there was no toxicology experts presented by the government. Nobody's showing that that sort of – that there was any sort of delay. I can take simple common knowledge for my use by doing trial work that when somebody overdoses, it's a pretty instantaneous reaction that you take those drugs, you overdose. And there was no overdose here. I think Bukowski didn't need to use the Narcan kit. She let A.K. go home with the Uber. There was – I think Bukowski testified at the hearing that there was some sort of maybe a reaction right away, but then it went into a mildly impaired state. So I think no matter what happened during the 6 hours or the 8 o'clock to 6 o'clock in the morning, 12, 10 hours, clearly shows that those drugs were not the drugs that killed A.K. And I think it clearly leads to a reasonable inference that A.K. must have gone out. And I know that Bukowski testified that A.K. took some of the drugs home with her. But as we clearly know, those drugs didn't have the effect or the potency or the ability to kill her. She had been a veteran heroin user. Bukowski testified that those drugs didn't do anything to her. And I think clearly Judge Shagid, who relied upon the sentencing guidelines in this matter, he erred and used it as a scratch. Well, he clearly erred in finding the factual basis that those drugs had caused A.K.'s death. And that's not even going to the issue where my client disputed and said, I don't know if those drugs were even the ones that did it. Bukowski clearly had a motive, a bone to get some advantage out of her because she never got charged. She admitted dealing the drugs. She gave the drugs. She never got charged. Her boyfriend never got charged. So there are some credibility issues there. So I think there's an issue where there was clearly erroneous findings by Judge Shagid that those drugs had caused A.K.'s death. And I think that he improperly abused his discretion in using that as an enhancement with respect to the sentence. What's the legal standard for the death or serious bodily injury results from? I think it's a substantial factor. Right. It's not but-for causation. I don't believe in the federal system it is, Your Honor. I think it's got to be a substantial factor. Substantial factor. And so to say that the drugs didn't cause is really the wrong question. It's whether they were a substantial contributing factor. Right. And didn't the autopsy confirm that? I don't remember that. I think there was some issue of fentanyl that was in the autopsy. They didn't find any drugs at the scene. They were all gone from my recollection. Right. Because the autopsy said it was fentanyl that killed her. And the drugs that Bukowski bought from your client and gave to her were laced with fentanyl, right? That's correct. But from my recollection, they didn't do it. They weren't a substantial factor because, clearly, I think something would have happened where it would have. I mean, fentanyl being in heroin is not an uncommon trait. It's not uncommon. So I think it's pretty reasonable during that 12 hours or 10 hours that she was by herself in her room that she could have gone out and gotten drugs that actually did the job and not been drugs that just caused mild impairment, which clearly I don't think were a substantial factor in her death. So I don't think that even under a substantial factor analysis, even assuming the government's case at its best analysis, giving all their inferences to the government, I don't think it rises to the level where they have met by preponderance of the evidence that those drugs had a substantial factor in causing her death because of the facts that I've laid out, where all they did was create a mild impairment. They didn't do anything else. She was there for two hours, as I've discussed. So I don't think that that is, by the reliable evidence showing, that there's preponderance that those drugs were a substantial factor in causing her death. Also, I think with respect to the obstruction of justice argument, I think we still have that same clearly erroneous standard. And I think even under that, it's an even stronger case that Judge Shadid clearly erred in finding that my client obstructed justice. He didn't lob testify that she was never scared. There was letters that my client said, I don't want to scare her. He just wanted her to tell the truth. He never wanted her to do anything but tell the truth. He wanted her not to be scared. When Ray Ray or Orlando Smith showed up at the Burger King, I think it was. Counsel, didn't lob testify that she indeed felt intimidated and threatened? Where do you find in the record that she said she was never scared? No, she testified. From my recollection, Your Honor, you're right. I did recall that she did testify that she was scared. But from my recollection, she testified that Ray Ray never got out of the car. He never showed a gun. He never flashed a firearm. He never did anything objective to scare her. And I think the phone calls, the letter was basically that my client just wanted her to tell the truth because my client was convinced him and Chaka had lied about the drug amount. Counsel, how do you square this circuit's case law that exhortations to witnesses to tell the truth do run afoul of the Prohibition Against Obstruction of Justice? I think when you look at that, you have to look at the surrounding circumstances. Like the state had cited the Cheek case, which basically said there was that issue in the Cheek case where they basically, the Court of Appeals said, yeah, he did tell Harris' daughter to tell the truth, but there were other circumstances in that that led to the conclusion that it was more than just tell the truth because in that case, the letter that Cheek wrote to Harris' daughter, clearly said, hey, look, you know, I'm going away for a long time. I'm your uncle, those sorts of issues. Now, I noticed that I have two minutes left, so I'll save my time for a moment. That's fine. Thank you, Your Honor. Thank you. Mr. Kinstra. Good morning, Your Honors, and may it please the Court. My name is Jeff Kinstra, and I represent the United States. The standards of review resolve this appeal. The district court's factual findings are reviewed only for clear error. Choices between competing inferences and credibility determinations cannot constitute clear error. So the defendant's arguments about what other inferences the court might have drawn or how he wishes the court had otherwise weighed credibility here fall short of showing any error on the part of the district court. As for the death, Ms. Bukowski testified in person that she personally obtained the drugs from the defendant and that she then personally gave them to the victim. The victim then took some of those in her presence, and contrary to the defendant's arguments that these were some inert drugs, Ms. Bukowski was quite taken aback by how strong they were and what effect they had on the victim. In fact, I think her words were, she was really, really messed up. She also texted her boyfriend around the same time that the victim was really effed up. And so, obviously, these were very strong drugs. Judge Sykes, I think you asked, the autopsy did confirm that fentanyl, a fentanyl analog, and another substance contributed to the death. Taking no issue with your comment about the standards, why do you conclude, obviously, these were very strong drugs when Bukowski subsequently testified that AK snapped out of it a few minutes later? So Ms. Bukowski testified that fentanyl is typically shorter lasting. It's much stronger, but it lasts shorter. And so the victim took the drugs in her presence and had a very strong reaction and then snapped out of it. And I think the significant point is she took the rest of the drugs home with her, and no drugs were found the next day when she was deceased. So that shows that she did take, or suggests that she did inject the rest of the drugs when she returned home. Was her paraphernalia found? I don't believe the record shows that, Your Honor. Does the record show what quantity of drugs she took with her? What was the total amount that Bukowski gave her? So the record shows that Major typically sold drugs in .4 gram bags, and I believe the victim took some of that in Bukowski's presence and then the rest of it home. But there's no evidence that there was other fentanyl, so to the defendant's other point that the victim had gone somewhere else for the drugs, the whole point or the whole reason that the victim got the drugs from Bukowski in the first place is that she was new to town and didn't have anyone else to buy from. And so we know that the district court didn't clearly err in finding that it was the drugs from Major that contributed to her death, and the autopsy confirms that the fentanyl and fentanyl analog did contribute to the death. What was the passage of time from when she left Bukowski's presence and went home and her death? So she left Bukowski's presence about 7.30, I believe. Her mother found her in her room at 5.30 the next morning, and she had been deceased for some time at that point. And where's the source of the information that she was new in town and had no other source of drugs other than Bukowski? Was it not Bukowski's testimony? It was Bukowski's testimony, but also the officer actually, I believe, testified to seeing text messages between the victim and Bukowski's boyfriend arranging a meeting. Primarily Bukowski's testimony, I believe, though, and the district court did credit that testimony. As to obstruction, the defendant's primary argument there seems to be that he just wanted the defendant – I'm sorry, he wanted Lobb to tell the truth. And the reason we know that's not accurate is that what he wanted her to say would have been false, that he was trying to undermine one co-defendant's testimony about the drug weights that were reflected in the pre-sentence report, and he ultimately withdrew his objection to those weights and the district court adopted them as its own findings. So in asking one defendant to undermine the other defendant's testimony in that, we know that what he's actually trying to do is not simply to implore her to tell the truth, but to falsely testify and to contradict the other co-defendant's truthful statements. And context, I think, confirms that because the defendant sent his enforcer, Ray Ray, the person who fixes things for him, to contact Ms. Lobb unannounced at her workplace. She hadn't told anyone where she was living or where she was working. She was, in fact, quite scared, so much so that she moved away two days later. So this sent a message loud and clear that the defendant knows how to get to her, and his recorded phone calls really leave no doubt that he was trying to influence her testimony. Under this court's cases in Cheek and Barber, I believe, that suffices to show obstruction. The defendant didn't get into acceptance or the sentence. With acceptance, I think the major point is that it was his own words as reflected in the phone calls and his allocution, not any objections that his attorney filed that the court relied on. As to the sentence itself, the defendant received a within-guideline sentence, which is presumed reasonable on appeal, and the defendant hasn't shown any reason to rebut that inference here. Unless Your Honors have any other questions, I'd ask this court to affirm. Thank you. Thank you. Mr. Rosen, anything further? Yes, Your Honor. Just a few points. First of all, I understand that there's issues of inference, but the court still has the burden of finding clear error. There's still an issue of clear error, which is what this court must decide. That is still an appellate issue, and that's something. They still have the burden of proof on the issue of fact. It's preponderance. I think that Mr. Keenstra is getting that mixed up, that it's not just a blanket that this court has to accept what Judge Shadid said in terms of his findings. The strength of the drug is what I think Mr. Keenstra said. She started out really messed up, but as Your Honor said, she snapped out of it very quickly, AK did, and then she was fine. Bukowski never had a Narcon kit there, never had a problem with it, never had to use it until about 730 she was mildly impaired. The Uber driver said she was mildly impaired. She gets home and she's mildly impaired. And I think that that's clearly a sign that these drugs did nothing more than mildly impair her. If this thing was even so toxic as to cause any sort of an issue, Bukowski would have used her Narcon kit. I think Mr. Keenstra talked about how when she was found she'd been deceased for some time. I think the issue with the officer who found her said was that the needle marks in her had been fresh, not some time, but fresh, and that's something that I think the court can consider. As far as the obstruction is concerned, Menchaca had motive to lie. She was facing her own criminal charges and was in cooperation stage. We all know that that creates a motive to lie. His conduct has objectively never said anything, and I don't think there was ever anything in the record where my client ever indicated that he actually sent Ray Ray to the Burger King. And he basically said after Ray Ray called him and said, hey, you went to the Burger King, they had a phone call. That's when my client said, well, I hope you didn't scare her. I hope she wasn't scared. And then Ray Ray said, yeah, I was scared, and then my client left. So I think that those are factors. If there's nothing else, I see I'm out of time. Thank you. Thank you. Our thanks to both counsel. The case is taken under advisement.